**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH H. HARDIEWAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:08cv0505 SNLJ** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Deborah

H. Hardieway ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits

("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Plaintiff has filed a brief in

support of her complaint; the Commissioner has filed a brief in support of his answer.  The

case was referred to the undersigned United States Magistrate Judge for a review and

recommended disposition pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Plaintiff applied for DIB and SSI in April 2005, alleging she was disabled as of

November 26, 1979, as a result of chronic asthma, curvature of the spine, bilateral carpal

tunnel syndrome, depression, high blood pressure, anemia, diabetes, severe rheumatoid

arthritis in her knees, excessive weight gain, and tooth loss. (R.[1] at 40-45, 89-91.) Her applications,[2] later amended to allege a disability onset date of October 2, 2003, were denied initially and after a hearing in August 2006 before Administrative Law Judge ("ALJ") James E. Seiler. (Id. at 12-23, 33-36, 50, 54, 69-73, 893-921.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 4-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that she was born on August 6, 1961. (Id. at 896.) She lived with her twenty-three year old daughter. (Id. at 896-97.) She was approximately 5 feet 3 inches tall and weighed 250 pounds. (Id. at 897.) She was right-handed. (Id. at 898.) She graduated from high school in 1979, completed beauty school in 1990, and was in the Army for two months until receiving a medical discharge. (Id. at 898-99.) She was one semester short of receiving a degree from a two-year college. (Id. at 918.) Her only source of income was food stamps and a utility check. (Id. at 898.)

---

[1] References to "R." are to the administrative record filed by the Commissioner with his answer.

[2] An earlier application for DIB was denied in September 2003 and not pursued further. (Id. at 231.) In his decision, the ALJ referred to three previous applications.

She had a driver's license, but seldom drove due to low back pain.  (<u>Id.</u> at 900.)  When she drove to the hearing she had to place a pillow at her lower back.  (<u>Id.</u>)  At most, she drove twice a week.  (<u>Id.</u> at 901.)

She last worked as a volunteer at the botanical gardens for six hours once a year.  (<u>Id.</u> at 901.)  She stopped in 2003 out of concern that she could not be as dependable as needed.  (<u>Id.</u>)  She had not had any other jobs since.  (<u>Id.</u> at 902.)

She had also worked as a hostess in a restaurant and as a hair stylist.  (<u>Id.</u> at 901-02.)  Pain in her wrists radiating to her shoulders and caused by carpal tunnel syndrome prevented her from working as a stylist.  (<u>Id.</u> at 902-03.)  She could not stand for any length of time because of low back pain.  (<u>Id.</u> at 903, 904.)  When she was in her "comfort zone at home," the longest she could stand without leaning on something was approximately 90 seconds.  (<u>Id.</u> at 904.)  When sitting, she constantly had to shift positions to try to get comfortable.  (<u>Id.</u> at 903.)  She sometimes stayed in bed to try to get comfortable, but she never had complete relief.  (<u>Id.</u> at 904.)  It hurt to walk.  (<u>Id.</u> at 905.)  She could not lift or carry a gallon of milk because of the wrist and back pain.  (<u>Id.</u>)  She was always in pain.  (<u>Id.</u>)  This pain prevented her from being dependable and from working.  (<u>Id.</u>)

Plaintiff further testified that she had injections in her knee in 2003.  (<u>Id.</u> at 906.)  She still had knee problems, however, and had to hold onto a railing when walking up or down stairs.  (<u>Id.</u>)  She had problems with her asthma in hot weather.  (<u>Id.</u>)  If she did not use her asthma medicine, she had an asthma attack.  (<u>Id.</u> at 908.)  She used a nebulizer when necessary, approximately once a month.  (<u>Id.</u>)  Her knuckles swelled daily and her feet

swelled 20 out of every 30 days.  (<u>Id.</u> at 909.)  The swollen feet limited what she could wear on her feet.  (<u>Id.</u>)  Also, she had been told to elevate her feet.  (<u>Id.</u>)  She took a "water pill" for the swelling, which was caused by high blood pressure.  (<u>Id.</u> at 910.)  The pill had a side effect of causing a need to frequently urinate.  (<u>Id.</u>)  She took an antibiotic for sinusitis and was allergic to grass.  (<u>Id.</u> at 910A.)  She had degenerative disc disease; however, her doctor had recommended massages and not surgery.  (<u>Id.</u> at 907.)  She could not afford the massages.  (<u>Id.</u>)  She was going to start a water aerobics program at the YMCA.  (<u>Id.</u> at 907-08.)

Because of the lifting and carrying required when she went to the grocery store, Plaintiff had help when she shopped.  (<u>Id.</u> at 907.)  She had to lean on the cart or use a motorized chair if one was available.  (<u>Id.</u>)  When she mowed her lawn, she used a self-propelling mower and had to periodically rest for 30 minutes.  (<u>Id.</u> at 910A-11.)  In general, she often needed to lay down.  (<u>Id.</u> at 911.)  She had difficulty falling asleep at night because of pain and nervousness.  (<u>Id.</u> at 914-15.)

Plaintiff went to the psychiatric clinic at Hopewell Clinic once for her depression.  (<u>Id.</u> at 912.)  She did not return a second time after the counselor she talked to then left the clinic.  (<u>Id.</u>)  She did not want to explain her circumstances again.  (<u>Id.</u>)  She was still depressed, which caused her to be irritable and have crying spells.  (<u>Id.</u>)  She was taking Wellbutrin, it did not help, and Effexor, it did help.  (<u>Id.</u> at 913.)  She could not explain why she no longer took the Effexor.  (<u>Id.</u>)

Plaintiff was a size nine, but gained weight because of the Prednisone she took for her asthma. (<u>Id.</u> at 897, 913-14.) She was on a diabetic, low calorie, low cholesterol diet. (<u>Id.</u> at 919.) She did not know how to count calories. (<u>Id.</u>)

Plaintiff testified that she was trying to quit smoking. (<u>Id.</u> at 914.) She had reduced by half – to ten cigarettes a day – the amount she was smoking. (<u>Id.</u>) She had quit on previous occasions, including once when the doctor told her she would not perform breast reduction surgery if Plaintiff was smoking. (<u>Id.</u>)

Plaintiff could no longer take a bath because her knee problems make it difficult for her to stand up. (<u>Id.</u> at 915.) She took a shower. (<u>Id.</u>) Her mother or daughter washed her hair for her. (<u>Id.</u> at 916.) She had problems doing her laundry because of difficulty bending down. (<u>Id.</u> at 915.) She did some yard work by sitting on a stool with wheels and taking her time. (<u>Id.</u>) Plaintiff used to dance and sing, but could no longer do either. (<u>Id.</u> at 917.)

Asked by the ALJ how she had supported herself since 1989, Plaintiff replied that she had been on welfare. (<u>Id.</u> at 918-19.) Her daughter also did not work. (<u>Id.</u> at 919.) Plaintiff babysat sometimes for her twin grandchildren. (<u>Id.</u>) She used to do so once a week. (<u>Id.</u>) When the grandchildren became more active, she could not run after them. (<u>Id.</u>) She saw her mother twice or thrice a week. (<u>Id.</u> at 920.) Her children either gave her a ride to her mother's or her mother came to her. (<u>Id.</u>) She did not take part in any church activities. (<u>Id.</u>)

Plaintiff was covered by Medicaid until her youngest child became 18 years of age. (<u>Id.</u> at 920-21.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and the reports of two examining consultants.

When applying for DIB and SSI, Plaintiff completed a Function Report. (Id. at 214-21.) She reported that she took care of her mother by spending a lot of time with her, monitoring her health if she has had a seizure, driving her to work, and taking her to doctor appointments and tests. (Id. at 215.) Although Plaintiff is a licensed hair stylist, her carpal tunnel syndrome and pain prevent her from working and from doing her own hair. (Id. at 216.) If she feels very bad, she tries to sleep through the pain. (Id.) She no longer bakes as she used to and now often simply prepares ready-to-serve meals. (Id.) She tries to help her mother, who lives alone, with chores. (Id. at 217.) She does not go out when she knows she should not be alone. (Id.) She then stays in bed or goes to the hospital. (Id.) Sometimes she can walk no farther than 25 to 30 feet because of the pain. (Id. at 219.) The steroids she takes have caused her to lose all but six teeth. (Id. at 220.) She wears braces or splints on both wrists for the carpal tunnel syndrome; she is afraid to have surgery. (Id.) She wears the brace on her right wrist every day. (Id.)

Plaintiff also completed a Disability Report. (Id. at 234-42.) She listed her height as 5 feet 4 inches tall and her weight as 220 pounds. (Id. at 234.) Her limiting impairments were chronic asthma, carpal tunnel in both wrists, edema, depression, high blood pressure, anemia, diabetes, lower back pain, severe rheumatoid arthritis in both knees, excessive weight

gain, and tooth loss.  (Id. at 234-35.)  Her impairments first bothered her on November 26, 1979, and prevented her from working that same day.  (Id. at 235.)  She tried, however, to work afterwards; she worked fewer hours and changed her job duties.  (Id.)  She stopped working on November 26, 1996, when the restaurant closed.  (Id.)  The job she held the longest was as a clerk for the Army in 1982.  (Id. at 235, 236.)

A Function Report was completed on Plaintiff's behalf by Vincent Durgey, a friend who had known her for 17 years.  (Id. at 222-29.)  He reported that Plaintiff quickly tired, and had done so for the past six years.  (Id. at 222.)  She was always in pain.  (Id. at 225.)  Plaintiff took care of her mother because of her mother's failing health.  (Id. at 223.)  She was not able to work as a hair stylist because she could not stand for long.  (Id. at 226.)  Her ability to pay attention was limited by her need to rest.  (Id. at 228.)  She wore braces daily.  (Id.)

In a Pain Questionnaire completed by Plaintiff, she described constant pain in her knees, lower back, hips, wrists, and, when swollen, right foot.  (Id. at 230.)  The pain had been severe since 1984 and was caused by sleeping, walking, sitting, standing, and stress.  (Id.)  She was compliant with her pain medication, although it had a side effect of slurred speech, irritability, and a need to avoid extreme sun exposure.  (Id.)  She had worn a carpal tunnel brace for almost two and one-half years.  (Id.)

Plaintiff completed another Disability Report after her applications were initially denied.  (Id. at 113-21.)  In addition to her previously described impairments, Plaintiff broke out in hives at least every other week.  (Id. at 113.)  She reported that she had first gone to

Hopewell Clinic for counseling in December 2001 and had last been there in June 2005.  (Id. at 1114.)  She had been prescribed Zoloft, Wellbutrin, and Neurontin.  (Id.)  She had also had two teeth extracted since she had first applied for DIB and SSI.  (Id. at 115.)  She further reported that her doctor would not give her a prescription for a medicine she needed for her "extreme reflux disease."  (Id. at 119.)  Because she is indigent, the only medicine she can be prescribed for her condition is ranitidine, which is the same as Zantac.[3]  (Id.)  In 2002, she had tried going to a pain clinic recommended by one of her doctors, but the clinic stopped taking Medicaid patients.  (Id.)

In a Work Activity Report requesting information about work after November 26, 1979, Plaintiff reported that she had been a private in the Army but had to leave basic training because of her asthma.  (Id. at 173-78.)  She had been hired as a pharmacy clerk, but was told she could not start work because they had made a mistake in thinking she could read medical records.  (Id. at 174.)  She worked in a fast food restaurant but had to quit because the oil smell made her sick.  (Id. at 175.)  In a second Work Activity Report requesting the same information, Plaintiff reported that she was sent by a temporary employment agency in 1980 to work for a country club for one day.  (Id. at 181-86.)  She worked for a telemarketing agency for a short time in 1980 but had to quit because of her medical condition.  (Id. at 183.)  In a third Work Activity Report, Plaintiff added that she had worked for an outreach program in 1987 until the funding ran out, worked in 1988 as a nail technician for a salon but quit after

[3]Zantac is a brand name for ranitidine, which is prescribed for the treatment of heartburn and indigestion.  Physicians' Desk Reference, 1495 (55th ed. 2001) ("PDR").

a racial remark was made, and worked in 1982 as a civilian clerk for the Army until the contract ran out.  (Id. at 189-94.)  And, in a fourth Work Activity Report, Plaintiff added that she had worked as a cashier and saleswoman in a store in 1985 until the store closed, worked in 1986 as a saleswoman in a shoe store until her then-husband said he was tired of driving her and her wages were insufficient to pay the babysitter, and worked in 1996 as a restaurant hostess until the business folded.  (Id. at 197-202, 205.)  A Work History Report completed by Plaintiff lists the job as a restaurant hostess, a job as a manager and stylist from 1992 to 1994, and two volunteer jobs.  (Id. at 206-13.)  For the job as a manager and stylist, she worked five or six days a week for eight to twelve hours a day.  (Id. at 210.)  On a daily basis, she supervised one person and hired and fired employees.  (Id.)

Plaintiff's earnings records reflect employment from 1978 through 1982, 1984 through 1988, and 1996.[4]  (Id. at 80.)  Her two highest amounts of annual earned income were $1,077.53 in 1979 and $2,915.73 in 1982.  (Id.)  In two employment years, 1978 and 1996, her annual earned income did not exceed $100.  (Id.)

On the day of the hearing, Plaintiff submitted a list of her current medications.  (Id. at 96.)  They included Prevacid, Naproxen, potassium, methocarbamol, tramadol, furosemide, Wellbutrin, Alubterol, Advair, and vitamin D.  (Id.)

The medical records before the ALJ are summarized below in chronological order.[5]

---

[4]A notation in the record indicates that Plaintiff's employment after 1979 was not considered substantial gainful activity.  (Id. at 204.)

[5]References to medical records for conditions unrelated to her listed impairments, e.g., mammograms or gynecological problems, are omitted.

Plaintiff was admitted to the John Cochran Veterans Administration Medical Center ("VAMC") on September 29, 1980, after an asthma attack. (Id. at 386-98.) She was started on several medications, including prednisone, and improved. (Id. at 387.) After a few days, her lung exam was normal and her dosages of prednisone were being tapered without difficulty. (Id.) She was discharged on October 6 to return to work the following week. (Id. at 386, 387.) Two weeks later, she returned with complaints of being shaky and nervous. (Id. at 459-460A.) She did not have any shortness of breath or wheezing. (Id. at 460A.) She requested a diet to lose weight and was continued on her current medications. (Id. at 459-60.) On October 29, she went to the nutritionist, reporting that she had gained weight between April and September. (Id. at 450.) She used to weigh 135 pounds and currently weighed 171 pounds. (Id.) She requested a strict diet and was given a 1200 calorie exchange diet. (Id.) The next month, she reported that the diet was too strict for her. (Id. at 456A.)

In February 1981, Plaintiff went to the VAMC after running out of asthma medications. (Id. at 453.) Six months later, she returned for the same reason. (Id. at 440-44.) Five days after the return visit, it was noted that her asthma was under control. (Id. at 439.) An October visit was again caused by Plaintiff running out of asthma medication. (Id. at 436-37A.) The notes of a December visit caused by an asthma attack include a reference to Plaintiff being a frequent emergency room visitor after running out of medication. (Id. at 430.)

Plaintiff returned to the VAMC emergency room in May 1982 after having an asthma attack. (Id. at 425-27.) Plaintiff was seen at the VAMC emergency room next in September

1986, and then again in October 1986, September 1987, and December 1987 for an asthma attack.  (Id. at 375-80, 384-85.)

Plaintiff was admitted to the VAMC on February 24, 1993, after being seen in the emergency room for exacerbation of her asthma secondary to an upper respiratory infection, and was discharged three days later.  (Id. at 334-74.)  She was 5 feet 4 inches tall and weighed 145 pounds.  (Id. at 339.)  Plaintiff reported that she had four to five mild asthmatic episodes each month.  (Id. at 342.)  It was noted that she had been admitted to the hospital in 1980 after her first episode of asthma and had not been hospitalized for asthma since.  (Id. at 345.)  She had worked as a beautician for the past five years and, before that, as a salesperson.  (Id. at 346A.)  It was also noted she had a 15-year history of smoking a pack of cigarettes a day and that this was a risk factor in the development of chronic obstructive pulmonary disease ("COPD").  (Id. at 348.)  Whereas asthma was reversible, COPD was not.  (Id.)  It was suggested that a pulmonary function test be run in two to three months for a baseline for comparison with a future test for diagnosis of COPD.  (Id.)  Plaintiff's productive cough was thought to be a "community acquired respiratory infection."  (Id. at 348A.)  She had a mild iron deficiency.  (Id. at 349.)  Plaintiff was started on medication to open her airways and given an antibiotic for the infection.  (Id. at 348, 351.)  Plaintiff was discharged on February 27 with instructions to return to the emergency room if her condition worsened and to keep clinic appointments when scheduled, including one for a pulmonary function test.  (Id. at 352.)

Plaintiff went to the emergency room at St. Louis University Hospital on December 12 after a tire exploded in her face. (<u>Id.</u> at 254-61.) She was examined, her wounds were cleaned, she was given ibuprofen, and she was released. (<u>Id.</u>)

Plaintiff went to the VAMC for shortness of breath and asthma attacks in December 1984 and in January 1985. (<u>Id.</u> at 416-20.) Each time she was treated with medication and discharged without hospitalization. (<u>Id.</u>) Plaintiff went to the VAMC in March 1985 after having an asthma attack. (<u>Id.</u> at 415-15A.) She had recently run out of her inhaler. (<u>Id.</u>) One was given to her. (<u>Id.</u> at 415A.)

On May 31, Plaintiff went to the VAMC emergency room after falling and injuring her back when roller skating. (<u>Id.</u> at 414-414A.) X-rays were negative. (<u>Id.</u> at 414.) She returned the next week with complaints of increased pain. (<u>Id.</u> at 411-13.) She was instructed to soak in a bath, apply heat, and take Tylenol for her pain. (<u>Id.</u> at 411.)

On September 13, Plaintiff went to the VAMC emergency room with complaints of swollen hands and feet, nervousness, and worsening asthma. (<u>Id.</u> at 409-10.) She was treated with an asthma medication and discharged. (<u>Id.</u> at 409.) Three days later, Plaintiff returned to the emergency room complaining of being depressed due to problems with her husband, children, and finances. (<u>Id.</u> at 408.) She was having crying spells and trouble sleeping. (<u>Id.</u>)

On March 3, 1986, Plaintiff went to the VAMC emergency room with complaints of shortness of breath and an asthma attack. (<u>Id.</u> at 406-07.) She used an inhaler at home, but had been out of one for a month. (<u>Id.</u> at 406.) She had been having daily asthma attacks with wheezing and shortness of breath. (<u>Id.</u>) She had been under a lot of stress recently and had

been smoking a lot.  (Id.)  On discharge approximately one hour later, she was instructed to stop smoking and take medication as directed.  (Id.)

In December, Plaintiff complained to the VAMC physicians of low back pain that was not relieved by Motrin.  (Id. at 403.)

The brief notes of a March 1987 visit to the VAMC include a reference to Plaintiff's complaints of low back pain and groin pain for the past four or five months.  (Id. at 402.)  Her asthma was described as stable in the notes of an April examination at the VAMC Women's Health Clinic.  (Id. at 401.)

After wheezing and being short of breath for two days, Plaintiff was admitted to the VAMC on February 14, 1999, for treatment of pneumonia with exacerbation of asthma.  (Id. at 307-33.)  She reported smoking one pack of cigarettes a day for 17 years.  (Id. at 307.)  The day after admission and after being treated with antibiotics, Albuterol, and Atrovent, she reported improvement in her shortness of breath and wheezing.  (Id. at 308.)  She was discharged on February 16 with tapered dosages of prednisone, a 14-day supply of Trovan (an antibiotic), and Albuterol and Atrovent inhalers and with instructions to avoid cold weather and wear a mask when it was windy.  (Id. at 308-09, 312, 313.)  She had an April 5 appointment at the allergy clinic.  (Id. at 330.)

Chest x-rays taken on March 18 were normal.  (Id. at 521.)

On April 6, a cervical spine x-ray taken at Barnes Jewish Hospital ("BJH") showed a straightening of her cervical spine, possibly due to muscle spasm.  (Id. at 520.)

Plaintiff was again admitted to the VAMC on May 1 after being seen in the emergency room two days earlier for a productive cough and shortness of breath, released, and then seen again in the emergency room that day.  (Id. at 270-306.)  Plaintiff reported that her asthma typically became worse that time of year.  (Id. at 270, 275.)  It was noted in the record that she had been hospitalized approximately five times, with the last being in February.  (Id.)  She had had a 20 to 30 pound weight gain, "likely secondary to prednisone."  (Id. at 271, 277.)  She smoked one-half pack of cigarettes a day, and had done so for 15 years.  (Id. at 271, 275A, 277A.)  She had a history of depression.  (Id. at 278A.)  On examination, she was in no acute distress, was alert and oriented to time, place, and person, had bilateral wheezing and coarse breath sounds, and had a history of low back pain.  (Id. at 271, 275A, 304.)  Her gait was stable.  (Id. at 278A.)  Plaintiff was started on intensive nebulizer treatments.  (Id. at 271-72.)  An x-ray taken two days after admission showed clearing of the right apical consolidation and lowering of the diaphragm compared to the x-ray taken when she was admitted.  (Id. at 272, 281A.)  Her oxygen saturation level, 86% on admission, had increased to 96% at the time of discharge.  (Id. at 271, 24A.)  Her peak flow had increased from 140 to 400.  (Id. at 272, 274A.)  Plaintiff was released on May 4.  (Id. at 272.)  On discharge, she was referred to the smoking cessation and allergy clinics.  (Id. at 284-85, 289.)

In June, Plaintiff reported to the allergy clinic that she had daily wheezing and shortness of air that responded to the use of an Albuterol inhaler.  (Id. at 269.)  She also had nocturnal wheezing every other night and itchy eyes in the summer and spring.  (Id.)  It was noted that she was taking a nasal steroid three times a day and that her reflux disease was

"well controlled" on ranitidine.  (<u>Id.</u>)  The next month, Plaintiff returned to the allergy clinic for testing.  (<u>Id.</u> at 267-68.)  It was determined  that she was allergic to grass and, to a lesser degree, to trees.  (<u>Id.</u> at 267.)  Plaintiff reported nocturnal symptoms twice a week when she next went to the allergy clinic on September 9.  (<u>Id.</u> at 265-66.)  She was under more stress than before.  (<u>Id.</u> at 265.)  On October 4, Plaintiff called the allergy clinic to request an antibiotic for her upper respiratory infection.  (<u>Id.</u> at 264-65.)  The nurse practitioner noted that Plaintiff was asthmatic with poor control at times of her symptoms.  (<u>Id.</u> at 265.)  Plaintiff was encouraged to use non-pharmaceutical measures, including rest, fluids, and vitamin C, and was prescribed a 14-day supply of clarithromycin.  (<u>Id.</u>)

On January 13, 2000, she again consulted the allergy clinic at VAMC.  (<u>Id.</u> at 263-64.)  She reported that she had stopped using two asthma medications, Serevent and Flovent, and an allergy medication, Vancenase, to see if they were causing the swelling in her arms and feet for the past three months.  (<u>Id.</u> at 263.)  She had not stopped using another asthma medication, Singulair.  (<u>Id.</u>)  The plan was to stop using the Singulair and restart on the Flovent and Serevent to see if it was the Singulair that was causing the swelling.  (<u>Id.</u>)  If not, she was to decrease the Flovent and restart taking Vancenase.  (<u>Id.</u>)  She was to continue taking the Prevacid.  (<u>Id.</u>)  Her weight was 226 pounds.  (<u>Id.</u> at 264.)  Her blood pressure was 108/39.  (<u>Id.</u>)

An electrocardiogram ("ECG") taken on March 13 was negative for myocardial ischemia.  (<u>Id.</u> at 519.)  It reflected a fair exercise tolerance.  (<u>Id.</u>)  A chest x-ray taken four days later showed only a mildly elevated right hemidiaphragm.  (<u>Id.</u> at 518.)  And, a

ventilation-perfusion scintigraphy performed on March 23 revealed a small perfusion defect at the superior segment of her right lower lobe; a chest x-ray taken the same day was normal. (Id. at 516, 517.)

Plaintiff consulted Susan Colbert Threats, M.D., with Central West End Internal Medicine, on April 16 for her low back pain. (Id. at 578.) It was noted that her pneumonia had resolved. (Id.) Symptoms of gastrointestinal reflux disease ("GERD") were thought to be secondary to diet and smoking. (Id.) Plaintiff was advised to stop smoking. (Id.) A sonogram of her abdomen taken in May to investigate her complaints of right upper quadrant pain showed no evidence of gallstones. (Id. at 515.) X-rays of Plaintiff's cervical and thoracic spines taken that same month revealed mild degenerative disease at C4 through C7 but no other abnormality. (Id. at 513-14.)

Plaintiff consulted Dr. Threats on August 2 for swelling and a sore throat. (Id. at 579-80.) Although her mood was improving, she remained depressed. (Id. at 579.) She was not going to physical therapy,[6] but was doing the exercises at home. (Id. at 580.) She was having difficulty walking due to an injury to her ankle on May 31. (Id.) And, she was completing a tapering course of prednisone. (Id.)

Plaintiff consulted Craig Boswell, M.D., on October 19 with BJH about her forearm and hand pain and swelling, which were worse at night. (Id. at 505-08.) Dr. Boswell noted that Plaintiff had been diagnosed with carpal tunnel syndrome and had been prescribed a carpal tunnel splint, which she had never obtained. (Id. at 505, 507.) X-rays of her wrists

_____

[6]There is no other reference in the record to her having been referred to physical therapy.

were normal.  (Id. at 503-04.)  She had a positive Tinel's sign[7] over her left carpal tunnel; "however, none of the rest of the exam [was] consistent with either carpal tunnel, cubital tunnel, or Guyon's canal symptoms."  (Id. at 506, 508.)  Her most common complaint was of swelling, not of numbness or pain consistent with a neurologic etiology.  (Id.)  She was to undergo nerve conduction studies and was given a left carpal tunnel splint to be worn at night and as often as possible during the day.  (Id.)

Plaintiff returned to Dr. Threats on December 15 with complaints of a cough and left-sided chest pain.  (Id. at 577.)  Dr. Threats suspected pneumonia, but an x-ray of her chest was normal.  (Id. at 502, 577.)

In January 2001, Plaintiff reported to Dr. Threats that she had had sinus drainage and a productive cough for the past 36 hours.  (Id. at 576.)  She was prescribed an antibiotic and was to follow up in several days.  (Id.)  The next month, it was noted that she had missed the last three appointments and that her asthma was "poorly controlled."  (Id. at 575.)

In March, Plaintiff reported that she had finished the course of antibiotics and was dehydrated.  (Id. at 574.)  A chest x-ray was normal.  (Id. at 501.)  Three weeks later, Plaintiff complained of irritation to her right eye and swelling in her hands, legs, feet, and ankles.  (Id. at 572-73.)  She had been short of breath the past week.  (Id. at 572.)  Again, her asthma was

---

[7]A "Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins or needles' in the distribution of the nerve."  MedicineNet.com, Definition of Tinel's sign, http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited Aug. 26, 2009). The Tinel's sign is often positive in a person with carpal tunnel syndrome.  Id.

described as being poorly controlled. (<u>Id.</u> at 573.) In addition to asthma, her history included recurrent pneumonia, intermittent leg swelling, and depression. (<u>Id.</u> at 572.)

The next month, on April 27, Plaintiff complained of sinus problems and a cough. (<u>Id.</u> at 571.) She continued to smoke. (<u>Id.</u>) Plaintiff briefly saw Dr. Threats on June 27 for a refill of a Vicodin prescription for chronic low back pain. (<u>Id.</u>)

An x-ray taken in July of Plaintiff's right hand was normal. (<u>Id.</u> at 499.) A computed tomography ("CT") scan of her paranasal sinus was also normal. (<u>Id.</u> at 500.)

Plaintiff saw Dr. Threats on August 1 for a continuing problem with shortness of breath and a cough. (<u>Id.</u> at 570.) She had trouble sleeping at night. (<u>Id.</u>) She continued to smoke one pack of cigarettes a day. (<u>Id.</u>) Pneumonia was suspected; a chest x-ray chest showed no evidence of active cardiopulmonary disease. (<u>Id.</u> at 497, 570.) When Plaintiff saw Dr. Threats three weeks later, she had a depressed affect and was focusing on "multiple episodes" of childhood sexual abuse. (<u>Id.</u> at 569.) She was given a tapering course of prednisone to resolve an asthma attack. (<u>Id.</u>) A glucose tolerance test indicated diabetes but also noted that the results should be confirmed by testing on a subsequent day. (<u>Id.</u> at 612-18.)

Plaintiff returned to Dr. Threats twice in September for treatment of her continuing cough. (<u>Id.</u> at 567-68.) She continued to smoke heavily, a habit which Dr. Threats thought might be secondary to her depression. (<u>Id.</u> at 567.) She had failed to keep four appointments with the pulmonary clinic and was not compliant with her asthma medication. (<u>Id.</u>) An x-ray

of Plaintiff's lumbar spine was normal; an x-ray of her chest again showed the mildly elevated right hemidiaphragm and no active cardiopulmonary disease.  (Id. at 495-96.)

A cholesterol test performed the next month indicated high cholesterol.  (Id. at 609-10.) A CT scan of Plaintiff's chest was within normal limits.  (Id. at 494.)

When Plaintiff returned to Dr. Threats in December for treatment of a cough, Dr. Threats noted that she was still smoking, was not compliant with her asthma medication, had multiple "no shows" at the pulmonary clinic, and had another appointment at that clinic in January 2002.  (Id. at 566.)

Complaining of a continuing cough and of diarrhea for the past three weeks, Plaintiff saw Dr. Threats on January 16.  (Id. at 564-65.)  Her diagnoses included bronchitis, asthma (secondary to smoking), and chronic generalized pain.  (Id. at 564.)  A chest x-ray was normal.  (Id. at 493.)  She was referred to the pain center, and prescribed Vicodin and a tapering course of prednisone.  (Id.)

A chest x-ray taken on February 24 indicated pneumonia and the mildly elevated right hemidiaphragm, but was otherwise normal.  (Id. at 606.)  An abdominal sonogram indicated a mildly dilated bile duct, but was otherwise normal.  (Id. at 605.)  Chest x-rays taken four days later showed improvement in the signs of pneumonia.  (Id. at 604.)

At her March 27 visit to Dr. Threats, it was noted that Plaintiff had not yet gone to the pain center.  (Id. at 559-60.)  Plaintiff reported having extreme pain in her back and left buttocks, unrelieved by the Vicodin.  (Id. at 560.)  X-rays of Plaintiff's chest and lumbar spine showed an unchanged elevation of her right hemidiaphragm and a mild dextrocurvature of her

lumbar spine.  (Id. at 491-92, 603.)  A chest x-ray taken the next month was normal with the exception of the elevated right hemidiaphragm.  (Id. at 489, 601.)

When Plaintiff saw Dr. Threats on April 18, she was upset about a letter informing her not to call the doctor at home.  (Id. at 557-58.)  She had persistent pain in her fingers.  (Id. at 557.)  She still had a cough and shortness of breath in the morning.  (Id. at 558.)  She had missed several appointments at the pulmonary clinic.  (Id.)

On June 6, a CT scan of Plaintiff's face showed "[l]imited mucosal thickening in the right frontal sinus and right anterior and middle ethmoid air cells."  (Id. at 488, 600.)  Later that month, an x-ray was taken of Plaintiff's right hand.  (Id. at 487, 599.)  It revealed a "[m]inimal amount of soft tissue swelling surrounding the proximal interphalangeal joint of the second digit of the right hand."  (Id.)

Plaintiff continued to have pain in the fingers of her right hand when she again saw Dr. Threats on July 9.  (Id. at 555-56.)  An x-ray of her hands and wrists was normal, as was a chest x-ray.  (Id. at 484-86, 597-98.)

Plaintiff complained to Dr. Threats on August 20 of chronic low back, knee, and shoulder strain.  (Id. at 553-54.)  Her chest wall was sore, sometimes even when she was resting.  (Id. at 554.)  She was diagnosed with pneumonia and an asthma attack and was given a vaccine for pneumonia and flu.  (Id.)  Chest x-rays taken that day and later read, however, showed no evidence of pneumonia and were normal.  (Id. at 595.)  A chest x-ray taken on September 23 suggested pneumonia.  (Id. at 483, 594.)  The next day, Dr. Threats described the pneumonia as resolving.  (Id. at 549, 551-52.)

Pneumonia was not listed as a problem when Plaintiff saw Dr. Threats in October. (Id. at 547-48, 550.) Bronchitis, asthma, tobacco abuse, and depression were listed. (Id. at 547.) Plaintiff was referred to the Hopewell Center ("Hopewell") for depression. (Id.) Depression was Plaintiff's only problem listed in the notes of her November visit to Dr. Threats. (Id. at 545-46.) It was also noted that her mother verbally abused her. (Id. at 546.) An x-ray taken at BJH five days earlier of Plaintiff's left shoulder to rule out a possible dislocation was normal. (Id. at 888-89.)

On December 16, Plaintiff went to Hopewell for an assessment of her depression. (Id. at 522-30.) She was diagnosed with major affective disorder. (Id. at 523.) Her current Global Assessment of Functioning[8] was 33.[9] (Id.) Her weight was 240 pounds. (Id.) Plaintiff reported that a close friend had recently died of breast cancer. (Id. at 525.) Plaintiff had moved in with her mother six weeks before after undergoing breast surgery to remove a gland. (Id.) She had also recently had an altercation with a cousin. (Id.) Plus, her mother had told her two weeks before that she would never amount to anything. (Id.) Plaintiff further reported that she had been sexually abused as a child by an aunt and a cousin. (Id. at 526.) She had been taking Wellbutrin, but it aggravated her asthma and did not work. (Id. at 527.)

---

[8]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[9]A GAF between 31 and 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Diagnostic Manual at 32.

She wanted to try another anti-depressant.  (Id.)  She was scheduled to see a psychiatrist in March.  (Id. at 544.)

The next day, Plaintiff returned to Dr. Threats, complaining of pain in her back and shoulders, a major depression episode caused by a fight with her cousin the day before, and poor sleep.  (Id. at 543-44.)  These problems were repeated when Plaintiff saw Dr. Threats again on January 23, 2003.  (Id. at 540-42.)

On January 26, Plaintiff went to the BJH emergency room complaining of pain on urination.  (Id. at 865-87.)  She was discharged home that same day.  (Id.)  A February 6 x-ray of Plaintiff's upper gastrointestinal tract revealed a tiny hiatus hernia.  (Id. at 477, 582.)  A sonogram of her abdomen ruled out gallstones.  (Id. at 478, 583.)  On February 28, Plaintiff again went to the BJH emergency room for complaints of pain after a drain inserted following breast reduction surgery two days before had pulled out.  (Id. at 840-61.)  A chest x-ray showed chronic elevation of the right hemidiaphragm, but no focal infiltrates.  (Id. at 476.)

Plaintiff reported to Dr. Threats in March that her asthma was better on Advair.  (Id. at 538-39.)  She had a chronic cough, osteoarthritis in both knees, and, the evening before, shortness of breath and chest pain.  (Id. at 539.)  She never went for the stress test recommended by Dr. Threats, but did go for the gastrointestinal series.  (Id.)  In May, Plaintiff saw Dr. Threats for knee pain.  (Id. at 536-37.)  The following week, on June 2, Dr. Threats administered lidocaine injections to both needs.  (Id. at 534-35.)  When Plaintiff next saw Dr. Threats, on July1, she complained of depression but not of knee pain.  (Id. at 533.)  A chest x-ray showed bilateral, mild perihilar infiltrates, possibly indicative of a mild volume

overload, and mild elevation of the right hemidiaphragm, but was otherwise normal. (Id. at 474.) An ECG was normal. (Id. at 475.)

Plaintiff returned to the BJH emergency room the evening of July 17 with complaints of nausea, back pain, vomiting, diarrhea, weakness, and dizziness. (Id. at 813-39.) She was diagnosed with a urinary tract infection, treated, and discharged home. (Id. at 832.) Plaintiff returned five days later with complaints of chest pain. (Id. at 773-811.) She had taken two sprays of her mother's nitroglycerin before coming. (Id. at 799.) Tests, including a stress echocardiograph and chest x-rays, were conducted and were negative for myocardial ischemia. (Id. at 782, 786-87.) Her instructions on discharge included taking ibuprofen for pain and stopping smoking. (Id. at 774.)

On October 2, Plaintiff went to the BJH emergency room with complaints of low back pain, nausea, bloody stools, and vomiting. (Id. at 749-72.) She was out of Prevacid. (Id. at 761.) Tests, including a chest x-ray, urine analysis, blood tests, and an ECG, were conducted. (Id. at 471, 472-73, 581, 754-59, 767-69, 771.) The chest x-ray showed only inferior spurring at the right acromioclavicular joint that was consistent with osteoarthritis. (Id. at 471, 581.) It did not show any pulmonary infiltrates, effusion, or pneumothoraces. (Id.) The ECG was negative for myocardial ischemia, but the low exercise tolerance did suggest a low to moderate risk of cardiac events. (Id. at 472-73.) Plaintiff was diagnosed with rheumatoid arthritis and esophageal reflux. (Id. at 750.)

Plaintiff went to the St. Louis ConnectCare ("ConnectCare") emergency room on March 1, 2004, for pain and swelling in her knees, pain in her back, right ear, and right

forearm and shoulder, and pain and a reduced range of motion in her right hip. (Id. at 673-78.) She had gone to the emergency room because she had run out of medication. (Id. at 675.) Her history included carpal tunnel syndrome in both wrists, pneumonia, chronic depression, asthma, back pain, and rheumatoid arthritis. (Id. at 674.) A wrist splint was applied to her right wrist. (Id.) She was diagnosed with depression, asthma, generalized muscle pain, and GERD and was prescribed Effexor, an anti-depressant, and Neurotin.[10] (Id. at 675.)

The next week, she saw Charles Lieu, M.D., with ConnectCare. (Id. at 655-57.) He listed her diagnoses as depression, for which he prescribed Effexor; obesity; thrush (an infection of the oral tissues), for which he prescribed a medication[11]; asthma, for which he prescribed Advair and Albuterol; and low back pain. (Id. at 657.) She was given a pulmonary and orthopedic referral and a follow-up appointment for one-month. (Id.)

Two days later, Plaintiff's mother completed a Patient Health Assessment on Plaintiff's behalf. (Id. at 652-53.) She listed 2002 as the year in which Plaintiff had a weight change and was diagnosed with diabetes and carpal tunnel syndrome and December 2002 as when she was treated for depression. (Id. at 652.) Medical records from that same day report that Plaintiff lived with excruciating pain every day, including left hip pain, and had been out of medication since August 2003. (Id. at 654.)

---

[10]Neurotin is prescribed for the treatment of partial seizures. PDR at 2459.

[11]The name of the medication is illegible.

- 24 -

On March 30, Plaintiff returned to Dr. Lieu.  (Id. at 649-50.)  She was in no apparent distress and her weight was stable.  (Id. at 650.)   On April 7, Plaintiff complained of a continuing cough.  (Id. at 648.)

Plaintiff missed her April appointment in the pulmonary clinic.  (Id. at 649.)

Plaintiff returned to the ConnectCare urgent care center on May 1.  (Id. at 668-72.) She was having difficulty swallowing and had a sore throat.  (Id. at 669.)  She reported that she had had a respiratory infection the previous month that had been successfully treated with the medication prescribed by Dr. Lieu.  (Id. at 670.)  She was diagnosed with thrush, prescribed another course of the medication, and told to follow up with her primary care physician in a few days.  (Id.)

Plaintiff kept a follow-up appointment with Dr. Lieu in May.  (Id. at 645, 646.)

Plaintiff continued to have problems with thrush when she returned in June to the ConnectCare urgent care center.  (Id. at 663-67.)  She had been drinking a lot of tea with sugar and thought she might have diabetes.  (Id. at 665.)  She was to see her primary care physician the next day.  (Id.)  At her next visit, on July 12, to the ConnectCare urgent care center, Plaintiff complained of itchy ears, a sore throat, and frequent urination.  (Id. at 658-62.)

Plaintiff's prescriptions were refilled in August, September, and October.  (Id. at 643.) At her November visit to Dr. Lieu, she was again given a pulmonary and orthopedic referral. (Id. at 639-40.)

Plaintiff next saw Dr. Lieu in December.  (Id. at 637.)  He refilled her prescriptions in January 2005 and saw her in February.  (Id. at 635-67.)  Plaintiff's mother requested a refill of Plaintiff's prescriptions on her daughter's behalf in March.  (Id. at 633.)  When Dr. Lieu saw Plaintiff in April he asked her to get some blood work done and renewed her various prescriptions.  (Id. at 631-32.)  Plaintiff missed her May and June appointments with Dr. Lieu.  (Id. at 634, 740.)

Plaintiff did, however, call ConnectCare for refills of her Albuterol inhaler in May and of carisoprodol in June.  (Id. at 740.)  She did see Dr. Lieu on June 23.  (Id. at 737-39.)

Plaintiff saw Dr. London with the ConnectCare orthopedic clinic on February 21, 2006, reporting that she could not go up and down the stairs without feeling pain in her knees.  (Id. at 736.)  She rated that pain as ten plus on a scale of one to ten.  (Id.)  She slept badly.  (Id.)  She had had rheumatoid arthritis for two years.  (Id.)  She was referred to the pain clinic.  (Id.)

On May 16, Plaintiff consulted Zarmeena Ali, M.D., with the ConnectCare rheumatology clinic.[12]  (Id. at 728-34.)  Plaintiff reported an increase in energy and a decrease in malaise since taking vitamin D during the past four weeks.  (Id. at 733.)  Her symptoms of polyarthralgia (pain in two or more joints) had improved with the combination of tramadol[13]

---

[12]The record refers to it being a follow-up appointment; however, with the exception of a blood test, see id. at 731-32, there is no earlier record from the rheumatology clinic.

[13]Tramadol is prescribed "for the management of moderate to moderately severe pain."  PDR at 2398-99.

and Naprosyn.[14]  (Id.)  She continued to have symptoms at night, however, primarily in her lower back, hips, neck, and shoulders.  (Id.)  She had not been able to have a previously-given prescription for a non-steroid anti-inflammatory drug filled.  (Id.)  On examination, she continued to have multiple fibromyalgia tender points, including on her neck, shoulder, knees, and lumbar spine.  (Id. at 734.)  She was to continue with her monthly doses of vitamin D. (Id.)  The prescription for tramadol was renewed; Robaxin (a muscle relaxant) and a five-day supply of Zithromax[15] were prescribed.  (Id. at 730, 734.)  Plaintiff was to stop smoking.  (Id. at 734.)  The doctor questioned whether her symptoms were consistent with degenerative joint disease or fibromyalgia.  (Id.)  A lumbar spine x-ray showed minimal degenerative changes. (Id. at 728.)  Plaintiff was to return in three months.  (Id. at 729, 734.)

Plaintiff consulted an ophthalmologist on July 26, 2006.  (Id. at 741-43.)  She was described as being a borderline diabetic and as having asthma, high cholesterol, and fibromyalgia.  (Id. at 743.)  She was given a prescription for glasses.  (Id. at 741.)

In addition to the foregoing records of Plaintiff's medical treatments, documents relating to her medical condition were before the ALJ, including written statements by Dr. Threats and reports of consultants.

---

[14]Naprosyn, or Naproxen, is a non-steriodal anti-inflammatory drug.  PDR at 2744.

[15]Zithromax, or azithromycin, is prescribed for the treatment of mild to moderate infections, including pneumonia.  PDR at 2542-43.

On November 28, 2000, Dr. Threats wrote a letter "To Whom It May Concern." (Id. at 744.) She stated that Plaintiff had asthma, recurrent pneumonia, carpal tunnel syndrome, and chronic back pain, and that Plaintiff was permanently disabled. (Id.)

Dr. Threats listed May 2, 2001, on a Total and Permanent Disability Cancellation Request as the date when Plaintiff's disability began and as the date when she could no longer work. (Id. at 745.) The form was completed by Plaintiff on May 2, 2001, to request that her student loan debt be cancelled. (Id.)

Pursuant to her applications, in June 2005 Plaintiff underwent a psychological evaluation by Thomas Davant Johns, Ph.D., and a physiological evaluation by Llewellyn Sale, Jr., M.D. (Id. at 689-703.) Dr. Johns described Plaintiff as being "irritable and defensive and altogether nominally to minimally cooperative in providing information about herself." (Id. at 689.) Her last psychiatric treatment was one year before. (Id.) That treatment was by Dr. Krojanker at Hopewell and included a prescription for Effexor for depression. (Id. at 690.) She was then taking an "unknown anti-depressant medication prescribed by her primary care physician." (Id.) She thought it helped. (Id.) Plaintiff reported decreased sleep and energy and a loss of eight pounds in the last six months. (Id.) She enjoyed her family. (Id.) Although she sometimes thought about hurting other people, she denied any intent to do so. (Id.) Plaintiff described her medical history as including bad knees, carpal tunnel syndrome on the right, back pain, right shoulder pain, asthma, and a lot of teeth pulled. (Id.) Her

medications included Advair, Klor-con (potassium chloride), dicolfenac,[16] carisoprodol ,

Flonase, ranitidine, hydrochlorothiazide, Albuterol, ferrous sulfate, Siproflican, Difulcan,[17]

Misolex, clotrimizole, and "presumably Effexor." (Id.) She wore a splint on her right wrist.

(Id. at 691.) She was spontaneous, relevant, coherent, and logical. (Id. at 692.) Her

cooperation with Dr. Johns was described as "fair minus." (Id.) On examination, she was

completely oriented; her practical knowledge and social judgment were intact. (Id.) Her

activities of daily living, including "most more advanced" activities, were described as being

"intact." (Id.) She did not carry groceries because of the carpal tunnel syndrome. (Id.) If she

paced her activities, she was able to do cooking, cleaning, and laundry. (Id.) She could not

stand longer than ten minutes without significant back pain. (Id. at 693.) It was unclear how

long she could sit or how far she could walk without a significant increase in pain. (Id.) Dr.

Johns described Plaintiff's social functioning as moderately impaired "due to personality

variables." (Id.) Her ability "to complete simple tasks in a timely manner over a sustained

period of time" was moderately impaired by her depression and chronic pain. (Id.) He

diagnosed her with depressive disorder, not otherwise specified ("NOS"), pain disorder

associated with psychological factors and general medical condition, and personality disorder,

---

[16]Dicolfenac sodium, or Arthrotec, is prescribed for the treatment of rheumatoid arthritis. PDR at 2977-78.

[17]Difulcan is prescribed for vaginal yeast infections. PDR at 2487-88.

NOS.  (Id.)  Her current GAF was 60.[18]  (Id. at 694.)  Her prognosis was "[g]uarded primarily due to the presence of personality variables."  (Id.)

Dr. Sale found it "almost impossible to obtain any reliable history from [Plaintiff] who is constantly complaining of her problems and moaning and saying that she is unable to sit or be comfortable in any position."  (Id. at 695.)  Those problems were listed as chronic asthma; bilateral carpal tunnel; high blood pressure; anemia; diabetes; low back problems and rheumatoid arthritis in her knees; tooth loss due to steroids; chest pain; depression; and excessive weight gain.  (Id. at 695-96.)  On examination, Plaintiff had a "[m]arked decreased in range of motion of several joints due to pain and also obesity."  (Id. at 697.)  She did not have any joint swelling.  (Id.)  Her gait was normal without the use of an assistive device, and she had no problem getting on and off the examination table.  (Id.)  She was not able to walk on her heels or toes or to squat.  (Id.)  She had a decreased range of motion in her lumbar spine and knee flexion was very painful.  (Id.)  She could not make a very good fist; her finger control was poor.  (Id.)  Straight leg raising caused bilateral pain.[19]  (Id. at 698.)  Her blood pressure was 123/81.  (Id. at 696.)  Dr. Sale's impression was of bronchial asthma; carpal tunnel bilaterally without surgery; high blood pressure; chest pain of unknown etiology;

---

[18]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic Manual at 34.

[19]A straight leg raise test is performed by a physician raising the leg up of a patient when the patient is lying flat on her back on the examining table.  Medscape Today, Managing Chronic Pain: Guidelines for Primary Care Physicians, http://www.medscape.com/viewarticle/487702_9 (last visited Jan. 20, 2009).  A positive straight leg raise or pain on such a raise is indicative of spinal problems. See Id.

"[s]ome type of anemia"; diabetes mellitus, untreated; low back pain, chronic in nature; absence of all but six teeth; depression; and excessive weight gain, but below morbidly obese level. (Id.) Also on examination, she was somewhat limited in her ability to flex or abduct her right elbow, i.e., 130E out of 150E, to flex her right wrist, i.e., 30E out of 60E, to forward flex at her hip, 80E out of 100E, and to bend at her waist, 70E out of 90E. (Id. at 702-03.) Her grip strength was 3 out of 5 and her upper extremity strength was poor. (Id. at 702.) Her effort was described as poor, but a notation reads, "can't test – pain!" (Id. at 703.)

Tereasa Davenport, a counselor with the Missouri Section of Disability Determinations, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in July 2005. (Id. at 155-62.) The primary diagnosis was bronchial asthma, the secondary diagnoses were scoliosis of lumbar spine and obesity, and hypertension was listed as another impairment. (Id. at 155.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk, or sit least 6 hours in an eight-hour day. (Id. at 156.) Her ability to push or pull was unlimited. (Id.) She had no manipulative, visual, or communicative limitations. (Id. at 158-59.) She had environmental limitations of needing to avoid concentrated exposure to extreme cold and to "fumes, odors, dusts, gases, etc." (Id. at 159.) She also had postural limitations; specifically, she needed to frequently limit climbing and stooping and occasionally limit balancing, kneeling, crouching, and crawling. (Id. at 157.)

The next month, Judith A. McGee, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff for the period from November 26, 1979 (Plaintiff's first alleged

disability onset date), to December 31, 1984, pursuant to her DIB application. (Id. at 123-36.) Dr. McGee concluded that there was insufficient evidence that Plaintiff had any mental impairment, including depression. (Id. at 123.) Pursuant to Plaintiff's SSI application, Dr. McGee completed another PRTF for Plaintiff for the period from April 1, 2005, to "at least" April 1, 2006. (Id. at 137-50.) For this latter period, Dr. McGee concluded that Plaintiff had a depressive disorder, NOS, pain disorder, and a personality disorder, NOS. (Id. at 137, 140, 144.) These three disorders resulted in a mild restriction in her activities of daily living and in moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Id.) There was insufficient evidence from which to determine whether the disorders resulted in any episodes of decompensation. (Id.)

Dr. McGee also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 151-54.) Of twenty listed mental activities, Plaintiff was assessed as being markedly limited in none. (Id. at 151-52.) She was assessed as being moderately limited in her ability to understand, remember, and carry out detailed instructions, in her ability to maintain attention and concentration for extended periods, and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id.) Her ability to accept instructions and respond appropriately to criticism from supervisors could not be rated based on the available evidence. (Id. at 152.) Her ability to function in the remaining 15 activities was not significantly limited or any evidence of limitation was lacking. (Id. at 151-52.)

**The ALJ's Decision**

The ALJ first noted that Plaintiff met the requirements for DIB only through December 31, 1984. (Id. at 13.) Because she amended her disability onset date to October 2, 2003, she no longer qualified for DIB. (Id.) After summarizing the sequential evaluation process, described below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after her amended disability onset date. (Id. at 14.) He next found that she had asthma, a straightened cervical spine, minimal degenerative changes to her lumbar spine, and soft tissue swelling in the proximal interphalangeal joints. (Id.) The combination of these impairments was severe. (Id.) Also, Plaintiff was obese. (Id.) Considering the affect of her obesity on her combination of impairments, the ALJ found that recent examinations indicated that her blood pressure was under control, her anemia did not result in any significant limitations to her residual functional capacity ("RFC"), and her diabetes mellitus did not require medication during her alleged period of disability. (Id. at 14-15.)

The ALJ found that Plaintiff did not have (a) significant and long-term impairments relating to her asthma, noting, among other things, that she had not been treated or hospitalized for asthma since 2003 and that she continued to smoke against medical advice; (b) a significant cardiac impairment; or (c) a significant spinal impairment, noting that the most serious spine-related impairment was a straightening of her cervical spine. (Id. at 15-16.) The ALJ further found that, although Plaintiff had also alleged disabling carpal tunnel syndrome and knee pain, she had not had surgery for any of her impairments and had no long-term and significant atrophy or loss of muscle tone in any of the areas affected by those impairments. (Id. at 17.)

Addressing Dr. Threats' letter stating that Plaintiff was disabled, the ALJ noted that the letter was written six years before; consequently, Dr. Threats did not have the benefit of reviewing more recent medical records. (Id.) Second, she did not explain what objective medical findings supported her conclusion. (Id.) Third, her course of treatment for Plaintiff did not indicate aggressive treatment consistent with what one would expect if Plaintiff was disabled. (Id.) Fourth, her conclusion was without substantial support from other evidence in the record. (Id.)

The ALJ next addressed Plaintiff's alleged mental impairments, noting that such impairments never resulted in an hospitalization. (Id.) Although Plaintiff reported that her depression improved when she was going to Hopewell, she did not return there after 2003. (Id. at 17-18.) Her anti-depressants were prescribed by her primary care physician. (Id. at 18.) This lack of consistent, ongoing medical treatment or counseling the ALJ found to be inconsistent with the alleged severity of her depression. (Id.) Additionally, although Dr. Johns had assessed Plaintiff's GAF as 60, indicating moderate difficulties in functioning, a single GAF should not be used as the sole basis for a finding of disability and the score of 60 was not supported by the longitudinal evidence, including that of Plaintiff's daily activities. (Id. at 18-19.) Based on Plaintiff's testimony and the record, the ALJ found that Plaintiff's mental impairments resulted in mild difficulties in social functioning; a mild impairment in her attention, concentration, persistence, and pace; and no episodes of deterioration or decompensation. (Id. at 19.) Her mental impairments, although severe, did not create a functional limitation and were not disabling. (Id.)

At the next, third step of the sequential evaluation process, the ALJ examined whether Plaintiff's impairments met or medically equaled an impairment of listing-level severity. (Id.) They did not. (Id.)

The fourth step required an evaluation of Plaintiff's RFC. (Id. at 20.) Addressing the question of Plaintiff's testimony about disabling impairments, the ALJ found that a review of her work history detracted from her credibility, noting that her current application was her fourth and that she would gain more from being disabled than she did from employment. (Id.) She also had a range of daily activities that was inconsistent with the alleged cardiac, pulmonary, and orthopedic impairments. (Id. at 21.) Giving her the benefit of the doubt, the ALJ found that Plaintiff's impairments precluded the frequent lifting of more than ten pounds and walking or standing for more than three hours out of an eight-hour workday. (Id.) These restrictions also precluded her past relevant work. (Id.)

Considering Plaintiff's age, education, vocational relevant past work experience, lack of transferable skills, and RFC and applying the Medical-Vocational Guidelines ("the Guidelines"), the ALJ determined that Plaintiff could perform the full range of sedentary work.[20] (Id.) She was not, therefore, disabled within the meaning of the Act. (Id.)

### Additional Medical Records Before the Appeals Council

After the ALJ entered his adverse decision, Plaintiff's counsel forwarded to the Appeals Council medical records from October 2005 to February 2006.

---

[20]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

In October 2005, Plaintiff consulted the health care providers at the Myrtle Hilliard Davis Comprehensive Health Centers ("MHDCHC") to establish a primary care relationship. (Id. at 715-16, 722, 724.) She reported a history of diabetes mellitus, GERD, depression, hypertension, and asthma. (Id. at 715-16.) Her medications included ranitidine, ferrous sulfate, Effexor, Flonase, carisoprodol, Darvocet, Advair, potassium, and hydrochlorothiazide. (Id. at 716.) Her weight was 236 pounds. (Id.) Her pain was a ten. (Id.) She needed a refill of Advair, hydrochlorothiazide, and potassium; she was given a prescription for Wellbutrin for depression. (Id. at 715.) She was unhappy with the medication previously prescribed for her GERD, and was given a trial run of Nexium. (Id.) The treating physician declined to prescript a narcotic for her arthritis pain and prescribed Arthrotec,[21] a non-steroidal anti-inflammatory. (Id.)

Plaintiff returned ten days later with complaints of unpleasant side effects from either the Arthrotec or the Nexium. (Id. at 714.) Her pain was a 5.5 on a 10 point scale. (Id.) Prevacid was prescribed to replace the Nexium and the dosage of Wellbutrin was increased. (Id.) As instructed, Plaintiff returned on October 25. (Id. at 713, 720, 723.) Although her symptoms of depression had improved on the Wellbutrin, she had an increase in irritability. (Id. at 713.) She had used her mother's Darvocet for pain. (Id.) She reported that previous x-rays had indicated that she was a candidate for knee surgery. (Id.) She wore a wrist sprint on her left hand. (Id.) The physician's assistant noted that Plaintiff's medical records would be obtained from Dr. Threats and ConnectCare. (Id.)

---

[21]See note 16, supra.

Plaintiff returned to MHDCHC in December, complaining of swelling in her feet and legs, sensitivity to light, pain in her lower back and right shoulder, and incontinence. (Id. at 710-12, 719.) She also was more short of breath than normal. (Id. at 712.) She reported a history of steroid-induced diabetes mellitus. (Id.) Steroids were stopped in 2003. (Id.) Her weight was 262 pounds. (Id.) Medications, including Ultram, were prescribed; a previously-prescribed Celebrex was discontinued because it gave Plaintiff no pain relief. (Id. at 710.) Plaintiff was to return in one week. (Id.) Plaintiff missed that appointment, but did return three weeks later, on January 26, 2006, requesting a refill of her medications and complaining of knee, wrist, and lower back pain. (Id. at 707-09, 717-18.) She could not open a tight jar lid. (Id. at 709.) It was noted that Plaintiff had been seen by an orthopedic doctor at BJH who had recommended surgery; however, she was afraid and declined. (Id.) Plaintiff was referred to the ConnectCare orthopedic clinic for her carpal tunnel syndrome, to the rheumatology clinic for her generalized muscle soreness, and to a nutritionist for a diet. (Id. at 708.) She was also referred to Hopewell for depression. (Id. at 707.) The Ultram was discontinued and Flexeril was to be tried. (Id.) The next day, a notation was made in Plaintiff's records that the social worker had been unable to talk with anyone at Hopewell and that the Hopewell staff had said that Plaintiff would need to call herself. (Id.) This was explained to Plaintiff, who said she would call Hopewell and arrange an appointment to see a psychiatrist. (Id.) The social worker explained to Plaintiff the importance of continuing psychiatric treatment. (Id. at 706.) Plaintiff needed a refill of two of her medications. (Id.) Plaintiff saw the nutritionist the following month, on February 13, and was given a diet. (Id.)

On February 28, Plaintiff went to MHDCHC for eye pain and difficulty in reading fine print. (Id. at 705.) She was given a single lens reader. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A).[22] The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work

---

[22]Because Plaintiff was not eligible for DIB at the time of the filing of her application, only citations to statutes and regulations governing SSI will be cited.

activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without

obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001). This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R.

§ 220.130(a). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed

if the nonexertional impairment does not diminish or significantly limit the claimant's RFC);

Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional

limitation restricts a claimant's performance of a full range of work at the appropriate [RFC]

level, nonexertional limitations must be taken into account and a nonguideline determination

made.").

     If the claimant is prevented by her impairment from doing any other work, the ALJ will

find the claimant to be disabled.

     The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547

F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable

mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting

<u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to

determine whether the Commissioner's decision is supported by substantial evidence, however,

the Court must consider evidence that supports the decision and evidence that fairly detracts

from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050

(8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence

would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have

"come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the agency's

findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ (a) improperly failed at step four to elicit testimony by a vocational expert ("VE") because she has significant nonexertional limitations caused by pain, depression, obesity, and asthma; (b) improperly found that she had past relevant work and inconsistently found that her asthma was severe and yet had not been treated since 2003; and (c) improperly assessed her credibility by (i) drawing inferences from her failure to have surgery and her lack of muscle atrophy and (ii) finding that her activities of daily living did not support her testimony. The Commissioner disagrees.

The Court will address the last argument first. "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subject pain complaints are not credible in light of objective medical evidence to the contrary.'" **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (quoting Ramirez, 292 F.3d at 581) (alteration in original). The objective medical evidence contradicts Plaintiff's complaints of disabling pain, asthma, obesity, and depression. This evidence includes multiple references to Plaintiff experiencing an asthma attack only when she ran out of medication or was not compliant with her medication. Although the records continue to cite asthma as a diagnosis

and Plaintiff continued to be prescribed medication to keep her asthma in control, she did not seek medical treatment for exacerbation of her asthma after 2003. Additionally, the ALJ properly noted that Plaintiff's failure to stop smoking as her doctors have instructed detracts from her credibility. See e.g., **McGeorge v. Barnhart**, 321 F.3d 766, 769 (8th Cir. 2003) (affirming ALJ's reliance on Guidelines in case in which claimant with shortness of breath continued to smoke despite doctor's directions to quit). Similarly, although the medical records consistently refer to Plaintiff's depression and consistently reference renewed prescriptions for anti-depressants, Plaintiff sought treatment for the depression only once. See **Spradling v. Chater**, 126 F.3d 1072, 1075 (8th Cir. 1997) (ALJ properly considered claimant's failure to seek more aggressive treatment when assessing his credibility). And, although complaining of obesity caused by the use of steroids, Plaintiff (a) consulted a health care provider only once about a diet and then rejected the diet given on the grounds it was too strict; (b) testified that she, with two years of college, could not count calories; and (c) continued to gain weight after no longer taking steroids. The medical records also refer to Plaintiff's pain; however, she failed to follow up with the referral to a pain management clinic.[23] See **Shannon v. Chater**, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."). Indeed, the majority of Plaintiff's voluminous medical records reflect visits to doctors for

_____

[23]In a Disability Report completed by Plaintiff she explained that she had not gone to a pain clinic as referred in 2002 because the clinic had stopped taking Medicaid patients. There is no indication in Dr. Threats' notes that Plaintiff offered this explanation to her or asked for a referral to a clinic that did accept Medicaid patients. Also, her medical records reflect that she was referred to a pain clinic in 2006 and there is no record of her having followed through with the referral.

prescription renewals and a consistent failure to follow-up with referrals made, or tests requested, by those doctors.

The ALJ also properly considered that Plaintiff's prospective SSI benefits would surpass all her earnings when assessing her credibility. See **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004); **Ramirez**, 292 F.3d at 581. See also **Juszczyk**, 524 F.3d at 632 (affirming ALJ's adverse credibility decision based in part on claimant's poor work history, including an absence of earnings at a level indicating substantial gainful activity even when not allegedly disabled).

Plaintiff argues that the ALJ improperly considered her activities of daily living as contradicting her testimony about the severity of her impairments. Plaintiff's testimony did describe restricted activities of daily living, e.g., she had to periodically rest when mowing the lawn, had difficulty doing laundry, and seldom drove. "[The Eighth Circuit Court of Appeals] has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." **Burress v. Apfel**, 141 F.3d 875, 881 (8th Cir. 1998) (internal quotations omitted). However, regardless of whether Plaintiff's daily activities could be construed as supporting her claims, "[t]he ALJ [is] not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996). See also **Choate v. Barnhart**, 457 F.3d 856, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record). In the instant case, Plaintiff's testimony was

sometimes contradicted by the record.  For instance, she testified that she seldom drove; however, she and her friend reported that she drove her mother to work and doctor appointments.  She alleged a disability onset date of October 2, 2003,[24] and yet on a form to request that her student loan be cancelled she listed May 2, 2001, as the date when her disability began.  She stated that she first went to Hopewell in 2001 and again in 2005.  The record reflects she was referred, and went once, in 2002.

Although, for the foregoing reasons, the ALJ did not err in assessing Plaintiff's credibility, he did err by not eliciting testimony from a vocational expert.

It is undisputed that Plaintiff has nonexertional impairments of asthma, obesity, pain, and arthritis.  Whether these impairments preclude application of the Guidelines, however, depends on whether they diminish her RFC to perform the full range of sedentary work.  See **Muncy v. Apfel**, 247 F.3d 728, 735 (8th Cir. 2001); accord **Holz v. Apfel**, 191 F.3d 945, 947 (8th Cir. 1999) ("If the nonexertional impairments significantly affect [Plaintiff's] RFC . . . the guidelines are not controlling and may not be used to direct a conclusion of not disabled.").

Plaintiff was found by an agency counselor to have environmental limitations of needing to avoid extreme cold, fumes, dusts, gases, and similar air conditions.  In **Sanders v. Sullivan**, 983 F.2d 822 (8th Cir. 1992), the Eighth Circuit considered the question whether an ALJ had erred by relying on the Guidelines and finding that a claimant could perform the

---

[24]The Court notes that October 2, 2003, is the date when Plaintiff went to the BJH emergency room and was diagnosed with rheumatoid arthritis and GERD.  Precipitating and aggravating factors may be considered when evaluating a claimant's credibility.  See **Finch**, 547 F.3d at 935.  There appear to be none in Plaintiff's case.

full range of sedentary work when the claimant needed to restrict his exposure to temperature extremes, dust, fumes, and humidity.  **Id.** at 824. "Although most unskilled sedentary jobs probably do not involve exposure to these conditions, this court has held that such a determination is improper without the benefit of further testimony such as that of a vocational expert."  **Id.**  This holding requires a remand for testimony by a vocational expert on the effect of Plaintiff's environmental limitations on her ability to perform the full range of sedentary work.

On remand, the ALJ should also elicit testimony by a vocational expert on the effect of Plaintiff's restriction to frequently limit stooping on her ability to perform the full range of sedentary work.  See Social Security Ruling 96-9P, 1996 WL 374185, *8 (S.S.A. 1996) ("Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.").[25]

## Conclusion

Plaintiff might not be disabled within the meaning of the Act.  The ALJ's decision that she is not disabled, however, is not supported by substantial evidence on the record as a whole for the reasons set forth above.  The case should be remanded to the Social Security Administration for further proceedings, including testimony by a vocational expert on the

---

[25]Because the Court finds a remand necessary, it declines to reach Plaintiff's argument that the ALJ's opinion included inconsistencies.

effect of Plaintiff's environmental and postural limitations on her ability to perform the full range of sedentary work.[26]  Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **up to and including September 8, 2009**, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of August, 2009.

---

[26]The Court expresses its disappointment that Plaintiff's claims may not be finally resolved after its analysis of the 900 plus page record because of a simple failure to call a vocational expert to testify and that neither party addressed the question of Plaintiff's environmental and postural limitations when stating their respective positions on the propriety of the application of the Guidelines.